IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 4, 2021 Session

## STATE OF TENNESSEE v. MAURICE "RICKY" BLOCKER

**Appeal from the Criminal Court for Shelby County
No. 12-03071, 12-61946    W. Mark Ward, Judge**

_____

### No. W2020-00543-CCA-R3-PC
_____

Petitioner, Maurice "Ricky" Blocker, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in finding effective assistance of counsel at both trial and on appeal. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Brandi Heiden, Memphis, Tennessee (post-conviction hearing); and Janet H. Goode, Memphis, Tennessee (on appeal), for the appellant, Maurice "Ricky" Blocker.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Petitioner was indicted by the Shelby County Grand Jury for one count of first-degree premeditated murder and one count of theft of property valued at $1,000 or more but less than $10,000. After a jury trial, Petitioner was convicted as charged and was sentenced to consecutive sentences of life imprisonment and eight years, respectively. This

Court affirmed Petitioner's convictions on appeal. *State v. Maurice Blocker*, No. W2015-0053-CCA-R3-CD, 2016 WL 3009255 (Tenn. Crim. App., at Jackson, May 18, 2016), *perm. app. denied* (Tenn. Sept. 22, 2016). The facts of this case as summarized on direct appeal are as follows:

> The Defendant-Appellant, Maurice Blocker, and Laticia Bodie, the victim, had a tumultuous relationship spanning several years. The victim told several individuals that she was "very afraid" of Blocker and was trying "to get away from him" shortly before her death.
>
> During the late night hours of April 14, and the early morning hours of April 15, 2012, Jerome Nettles was watching a movie with his girlfriend, Octavia Greer, and her mother, Katie Greer, at the Greers' home. Earlier that day, Blocker stopped by the Greers' home and asked Katie to do some laundry for him. Blocker returned later that evening with the victim in a maroon truck, and they sat on the porch with Katie and drank alcohol, although no one was severely intoxicated. Although Blocker and the victim appeared to have been drinking when they arrived at Katie's house, the couple was calm and sociable and did not appear to be arguing. At one point, the victim went inside the home, ostensibly to use the bathroom. Once inside, she asked Nettles and Octavia to call the police because Blocker had beaten her earlier that night and had forced her to come with him to the Greers' home. Octavia informed her mother of what the victim had told her and asked her if she should call the police. Katie, who had seen Blocker beat the victim in the past, told Octavia not to call the police because she was going to take the victim to a safe place. A short time later, Blocker came inside the house to use the bathroom. When he returned to the living room, he could tell that Katie, Octavia, Nettles, and the victim had been talking about him. Katie said that she was going to take the victim on a beer run, and Blocker replied that the victim was not going anywhere. Katie then physically placed herself between Blocker and the victim. When Katie told Blocker that the victim could stay at her house but that he had to leave, Blocker became angry and violent and began swearing at the victim. He then brandished a knife and demanded that the victim leave with him. The victim declined, and when Nettles tried to push Blocker out the door, Blocker got angry and pulled a second knife on Nettles, which resulted in Octavia going outside to call 9-1-1. As Nettles got out of Blocker's way, Katie begged Blocker to leave her property, but he refused.

After Nettles removed himself from the altercation, Blocker walked toward the victim, who dropped to the floor and began begging for her life. Blocker started punching the victim and kicking her with his work boots as she was lying on the floor. The victim did not try to fight Blocker. As Blocker was beating the victim, Nettles headed to the kitchen to get a stool he could throw at Blocker. Katie screamed for the victim to run, and although the victim tried to escape, she fell as she was running down the hallway. Blocker immediately jumped on the victim and stabbed her several times, saying, "[N]ow, bitch, you can go." Before he left, Blocker told Katie, "Done now, bitch." Then he calmly walked out of the house and got into the maroon truck before quickly driving away. Blocker never attacked Octavia, Katie, or Nettles during the incident and directed his anger and violence only at the victim.

Octavia, who had been on the line with the 9-1-1 dispatcher, had given the maroon truck's license plate number to the dispatcher as she was waiting for the police to arrive. This license plate belonged to a truck that had been recently reported stolen.

Although Katie attempted to administer first aid to the victim as they waited for the ambulance, the victim died from her injuries. The autopsy established that she sustained four stab wounds to her neck as well as a stab wound to her face and a cut to her right forearm. The victim bled to death from the three fatal stab wounds she received to her neck.

Blocker had acted violently toward the victim prior to the stabbing incident. On September 14, 2009, the police responded to a call and encountered the victim, who was shaking and had a laceration over her eye and bruises and swelling to her head. The victim told the officers that Blocker had hit her with a vodka bottle. She also told them she was scared of Blocker and was trying to get away from him. On November 30, 2011, the police responded to a call in which the victim said that Blocker had been standing on her porch with a gun, threatening to kill her and her current boyfriend. When the police arrived, the victim appeared scared and upset.

At around 10 a.m. on April 12, 2012, a couple of days prior to the victim's stabbing, Sergio Arellano was laying bricks at a gas station on Third Street in Memphis when he saw an African-American man get into his truck, crank it, and drive away in it without his

- 3 -

permission. Arellano's truck was a maroon 1997 Ford F–150 with Tennessee tags that was worth approximately $3,000. Arellano contacted the police to report his truck as stolen and provided responding officers with the color, make, model, year, and either the VIN number or license tag number for his truck. The truck's description was then placed into a national database for stolen vehicles. On April 26, 2012, a truck with a VIN number matching the truck stolen from Arellano was found in Little Rock, Arkansas. Although the truck's original license plate had been replaced with another plate, the VIN number for the truck came back as the stolen truck that had been driven by Blocker when he left the scene of the stabbing.

Officers traced Blocker's Electronic Benefits Transfer card and discovered that the card had been used at a Walgreen's pharmacy in Chicago just after the stabbing, and photographs from the pharmacy confirmed that Blocker had used the card to purchase items. The card was then used in Los Angeles, where Blocker was finally detained by law enforcement on June 15, 2012.

Dr. James Walker testified as an expert in the field of forensic neuropsychology. He reviewed Blocker's school, medical, jail, police, and criminal records as well as Dr. Murray Smith's reports before interviewing Blocker and giving him a variety of tests. Dr. Walker determined that Blocker's IQ was 75, which meant that Blocker was unable to think and reason as effectively as the average person. He added that Blocker's years of alcohol and drug abuse, which permanently damaged his brain, further impaired his brain functioning.

Dr. Walker said that Blocker had told him that in the three or four days prior to the stabbing, he and the victim had been drinking, using large amounts of cocaine, and sleeping very little. As a result, Dr. Walker opined that at the time of the stabbing, Blocker was unable to make decisions effectively or to consider the consequences of his behavior. Dr. Walker also opined that Blocker would have been unable to form intent or to premeditate the victim's murder, explaining that Blocker "got very angry and he acted out impulsively, without thinking, without reasoning, in a very horrific way." Dr. Walker admitted that he did not observe Blocker on the night of the offense and did not know his alcohol level or whether Blocker had consumed any cocaine at the time he stabbed the victim.

- 4 -

He also admitted that he did not perform a CAT scan on Blocker to determine whether there were physical signs of brain damage. Dr. Walker acknowledged that Blocker beat the victim before stabbing her several times and that he did not injure the other individuals that were present, even the ones who were trying to get him to leave the property.

Dr. Murray Smith, a specialist in internal medicine, testified as an expert in the field of addiction medicine. He consulted with Dr. Walker and reviewed Dr. Walker's reports before personally evaluating Blocker. Dr. Smith determined that Blocker suffered from the disease of addiction and that he had sustained brain damage due to his prolonged abuse of drugs and alcohol. Dr. Smith opined that Blocker was unable to premeditate or control his behavior the night of the offense in light of his brain damage, his intellectual dysfunction, and the alcohol and drugs in his system.

Dr. Smith acknowledged that he did not observe Blocker at the time of the offense and did not know how many drinks or how much cocaine he had consumed prior to the stabbing. Although he admitted that he did not perform a CAT scan on Blocker to determine if there were physical signs of brain damage, he claimed that Dr. Walker's tests more accurately determined whether a person's brain was functioning normally. He admitted that Blocker's compromised brain function did not prevent him from asking Katie Greer to do his laundry, arming himself with knives, going over to Katie Greer's home, or deciding not to stab Nettles.

*Id*. at *1-3.

*Post-conviction Hearing*

At the post-conviction hearing, Petitioner testified that trial counsel failed to object to hearsay testimony at trial "about six or seven times, maybe." He asserted that trial counsel should have objected to the following testimony during Katie Greer's direct examination concerning a statement by Ms. Greer's daughter:

Q.      When you walked into the house, what did you see?

A.      [The victim] wasn't in the bathroom. She was talking to my daughter, Octavia, and she had told Octavia that he had

- 5 -

> beat her up, and the he had made her come to my house
> with him and for her to call the police.

Petitioner asserted that "[i]t was a hearsay statement that he didn't object to and it allowed the jury to hear it, you know." Petitioner complained that trial court failed to object to a second hearsay statement by Ms. Greer that her daughter had told her: "And so, when [Petitioner] went to use the bathroom, [the victim] had told my daughter that he had beat her up and made her come with him." Petitioner testified that the victim was his girlfriend. Petitioner also asserted that trial counsel failed to object when Ms. Greer testified that "[the victim] told my daughter she didn't want to leave with [Petitioner]" and that "[the victim] told my daughter and them that she didn't want to leave."

Petitioner testified that trial counsel failed to impeach Ms. Greer's testimony with a prior inconsistent statement. He explained that "Katie Greer stated that I said to [the victim], 'Done now, bitch,' or something like that." Petitioner admitted that trial counsel challenged Ms. Greer's testimony by stating: "Ms. Greer, when you gave - gave a statement to the police that morning you never said anything about 'Done now, bitch,' did you?" However, he said that trial counsel then withdrew the question and did not pursue his challenge to Ms. Greer's inconsistent statement.

Petitioner testified that he was prejudiced by "juror bias." He said that during trial, "one of the jurors gave the bailiff a note and gave it to [the trial judge] and told him that they remember seeing my face on [television] and remembered me." He believed that the juror had been untruthful prior to trial by failing to inform the trial court that she had seen Petitioner on television. Petitioner testified that when the issue was brought to trial counsel's attention, trial counsel said "they should come back with reckless homicide." He did not recall trial counsel asking for a jury-out hearing on the matter to determine whether the juror was biased as a result of her exposure to Petitioner, and trial counsel did not request a mistrial.

Petitioner testified that trial counsel should have raised as an issue in his motion for trial that the trial court abused its discretion concerning jury instructions by telling the jury when the indictment was read that Petitioner pled guilty to count two, theft of property. Petitioner asserted that he never pled guilty to the theft charge.

Petitioner testified that appellate counsel was ineffective for "failing to raise the issue with respect to the issue of whether [Petitioner] pled guilty or did not plead guilty and the jury instructions[.]" When asked why he felt that he was entitled to post-conviction relief, Petitioner asserted that he should not have been charged with first degree murder because he did not plan the murder. Petitioner asserted that if counsel had been effective, he would have been convicted of second-degree murder.

- 6 -

On cross-examination, Petitioner agreed that several witnesses saw him stab the victim. The only issue at trial was the degree of murder of which he was guilty. Trial counsel presented a defense of diminished capacity due to Petitioner's alcohol and drug abuse. Petitioner testified that he never thought of pleading guilty to theft of the vehicle in order for the jury to know that he accepted some responsibility for his actions. He said that he was surprised to hear trial counsel announce that he was pleading guilty to the charge, and he then told trial counsel that he did not want to plead guilty. Petitioner agreed that he fled after the murder, but denied that he was in the stolen truck. He did not recall talking to trial counsel about the benefit of pleading guilty to the theft charge in front of the jury in order to limit the proof that he fled the jurisdiction in the vehicle. Petitioner testified that he and trial counsel never discussed trial strategy other than a diminished capacity defense.

Trial counsel testified that he had been employed by the public defender's office for more than twenty years. He asserted that he did not object to hearsay testimony by Ms. Greer because she was "partially helpful" to the defense. Trial counsel said:

> I think we'd actually been to her home, sat and talked to her on her porch before the trial. The things she was talking about were going to come out anyway because all of these people were there at the time of the offense and were available for trial. So rather than object to things that were coming in anyway, I thought if I'd done that, I would highlight those things for the jury. I tried to more concentrate on our side of the defense about how out of control the situation was, how everyone was intoxicated and how maybe even the - - the heat of the room and - - and the passions played into our arguments.

Trial counsel remembered challenging, as an inconsistent statement, Ms. Greer's testimony that she heard Petitioner say, "Done now, bitch," after he stabbed the victim. He said that he questioned her as to why the statement was not mentioned in any police report. When asked if Ms. Greer's assertion that she did not remember making the statement was sufficient to further impeach her credibility, trial counsel testified:

> At the time I wish she hadn't have said it. It was definitely not helpful, but at that point, rather than belabor the issue and again highlight it for the jury, I tried to turn a bad thing into a good thing. You know, this was definitely an out of - - out-of-control situation. And that was part of our argument is that there was no control. There was a total lack of control and there was no mens rea commensurate with premeditation and intent.

Concerning juror bias, trial counsel testified that he recalled there being a juror who came forward as soon as she recalled seeing Petitioner's face on a television news report two years prior to trial. Trial counsel said that he did not request a jury-out hearing for the trial court to question the juror as to her bias because he liked the jury, and he "didn't think [they] were going to get any better if [they] excused this juror." He did not think that the juror was biased. When asked if the issue of the guilty plea to theft should have been raised in a motion for new trial because there was no clarity at trial as to whether Petitioner actually pled guilty, trial counsel testified: "My recollection is as imperfect as anyone else's. However, my recollection is that we did discuss it with him. I could be wrong." Trial counsel specifically recalled discussing a guilty plea with Petitioner prior to trial. Trial counsel further testified:

> This is a strategy we used back starting with Gerald Skahan when he was on the team, and we don't necessarily tell the State we're going to do it first. We do it in order to get some credibility with the jury to - - to say, Look, we're - - we're willing to admit what we did, but the State has over charged and we need your help solving this disagreement with the State. We think it's really a lesser kind of crime.

The post-conviction court also made statements concerning the guilty plea:

> [L]et me just say this for the record, the Court didn't know. Had I known I would've probably done something about it, but I'm ambushed as much as anybody else is ambushed. And I've got to do something with it. Guy stands up in open court and says I'm guilty of one of these, the lesser one, and I certainly understand the strategy of - - decision for doing so, but I can say the Court had no knowledge of that.
>
>     \*     \*     \*
>
> So, anyway, that's - -I'll just say that for the record that I was surprised as anybody, but not that surprised since the defense team had done that next door - -
>
>     \*     \*     \*
>
> - -in Division 10 on another case, I, you know, wasn't totally surprised, but what was surprising to the Court is how do I deal with this now. He stood up in court and said, I'm guilty of this lesser charge, and, of course, I had difficulty deciding what to do with that.

- 8 -

The post-conviction court further noted that Petitioner was sitting in the courtroom when the indictment was read, and his defense team said that Petitioner pled guilty to the theft but not the murder. The post-conviction court said:

> And he sits there with his hands - - no, I'm not going to say - - he remained silent and doesn't say a word. And now he's getting up here and saying his lawyers never discussed this with him and I've got two other lawyers, [. . .], about to testify. And, quite frankly, if they pled him guilty without prior discussing it with him, they're probably all guilty of violation of the canon of ethics. So I don't believe for one minute that he didn't have advance notice of this. But we've got two other lawyers to testify, and they may come in here and say, No, we just secretly pled him guilty without him knowing about it in advance.

Trial counsel did not recall Petitioner saying anything to him after it was announced at trial that Petitioner pled guilty to the theft charge.

Trial counsel testified that he read the jury instructions prior to them being read to the jury. He did not feel that it was necessary to address the trial court to state that Petitioner had pled guilty to the theft in count two. When asked why he did not feel that the jury sheet should have stated that Petitioner pled guilty in count two, trial counsel testified:

> Well, I mean, that's kind of the point of throwing a wrench into that process. I mean, when the proof is that in a room full of people [Petitioner's] standing over a woman begging for her life and then murders her, any amount of confusion that I can provide the jury, I think is going to be helpful. And to the extent that we can later come and say, Look, we told you what we did. This is unnecessary. This is proof now the State has overcharged. That's the whole point in doing it that way.

On cross-examination, trial counsel testified that the defense team discussed the decision for Petitioner to plead guilty to theft in front of the jury. He reiterated that the issue was also discussed with Petitioner. Trial counsel testified there was no indication that the juror who recognized Petitioner from television was untruthful during voir dire. It seemed to trial counsel that the juror spontaneously recalled after deliberations had begun that she had previously seen Petitioner on a newscast. Trial counsel testified that he did not request a mistrial because he had faith in that particular juror and the entire jury panel. He noted that he was also concerned that if a mistrial were granted, the State would be

- 9 -

given a "preview" of Petitioner's diminished capacity defense, and be more effectively able to challenge the defense at a new trial.

Trial counsel did not recall whether Ms. Greer had given a formal statement that he could use to impeach her credibility. He also noted that it would be difficult to impeach someone's credibility using only a police report. Trial counsel agreed that he could have called the officer who spoke with Ms. Greer; however, he said that it was typically not helpful to the defense to call a law enforcement officer to testify for the defense.

With regard to hearsay statements by Ms. Greer, trial counsel agreed that Ms. Greer was in and out of the house and actually heard some of the statements made by the victim before her murder. He noted that other people also heard the statements and were available to testify at trial. Trial counsel testified: "And it didn't make any sense to really challenge Ms. Greer who was [sic] I was hoping would say some helpful things. And she did." Trial counsel described Petitioner's case as "[u]nwinnable" because there were too many witnesses and "[t]oo bad injuries." He said that there was simply no way to challenge identity in this case. When asked if proof of the theft was overwhelming, trial counsel testified: "It was obvious that they were going to prove that count, and to my recollection that was the discussion we had is that maybe we should not challenge that part of the trial in order to gain some credibility with the jury." He said that they were also trying to limit proof of flight. Trial counsel agreed that it was difficult to overcome the effect on the jury of the victim's injuries and her pleading for her life.

Co-counsel testified that at the time of the post-conviction hearing, she had worked as an assistant public defender for twenty-two years. She worked on Petitioner's case and prepared the motion for new trial. Co-counsel did not recall any discussion with Petitioner about raising the issue of the guilty plea in the motion for new trial. She said, "I wouldn't - - normally I would not want to plead that out before the murder charge because I'd be afraid it would affect the case. So I think we just left that open."

On cross-examination, co-counsel testified that she raised issues in the motion for new trial that she thought would have been the strongest ones and that she got input from other members of the defense team about what issues should be raised in the motion.

Appellate counsel testified that he worked in the public defender's office and specialized in appeals. He recalled drafting the appellate brief in Petitioner's case. He said: "The issues raised on appeal are generally limited to those issues raised in the motion for new trial and plain error if there's any available but that's fairly rare." Appellate counsel noted that he did not raise everything on appeal and that "[w]e always advise the trial attorneys to raise everything they can think of and then we pair it down to what we think has some merit to it." When asked why he failed to include an issue on appeal as to

- 10 -

the trial court's jury instructions on Petitioner's guilty plea to theft, appellate counsel testified:

> Well, I don't think there was testimony he pled guilty. I think he tried to plead guilty and the Court didn't accept it so it's not really a guilty plea. I think the only thing he might have criticized was I believe at the close of proof the jury was told he pled not guilty to the homicide and guilty to the theft, which is accurate. Only reason I raised it in the brief is I thought the evidence was insufficient on the theft of the truck and I didn't want the Court to think well he pled guilty to it so that's all we really needed. I didn't think it was an issue for the Court of Criminal Appeals.

When asked if he felt that plain error could have been raised, appellate counsel testified:

> No, no. No, I think it was dealt with the way it needed to be. And frankly, the issue with the theft of the truck wasn't really the meat of this case. This was a homicide case. You know, if he was going to do life, then, you know, the truck really didn't matter. And we made a good argument I thought on the sufficiency of the truck but they didn't accept it.

On cross-examination, appellate counsel agreed that he raised the issue of the guilty plea by challenging the sufficiency of the evidence since the guilty plea was never accepted. He said:

> A guilty plea is a guilty plea until the Court accept[s] it so I just wanted to make that clear to the appellate court that it wasn't accepted. He didn't really plead guilty to the theft of the truck no matter what one of the trial attorneys may or may not have tried to do.

Appellate counsel testified that he did not recall discussing which issues to raise on appeal with Petitioner's trial counsel and co-counsel. He said: "I don't typically discuss appellate issues that are going to be raised with trial attorneys unless I think I need some elaboration from them." Appellate counsel noted that he had been doing appellate work for more than twenty years.

Judith Williams, Petitioner's younger sister, testified that Petitioner had been addicted to drugs since he was a teenager and that he always carried a weapon. She said that Petitioner took pills and drank "lots of alcohol." Ms. Williams testified that she had known the victim since 2004 when Petitioner and the victim began dating. She said that

- 11 -

the victim used drugs "everyday all the time." She testified that no one from the Public Defender's Office attempted to interview her concerning Petitioner.

On cross-examination, Ms. Williams testified that she was aware Petitioner was sometimes violent toward the victim, although she had not witnessed any specific incidents of violence. She was not present during the offenses in this case.

Kioni Logan, Petitioner's niece, testified that Petitioner had lived with her most of her adult life and that he had used drugs for as long as she could remember. She said that he stayed with her because "we were trying to get him off drugs and stuff, and he does pretty good, you know, when he's with me." However, Ms. Logan testified that Petitioner could not stay off drugs because the "drugs were just too much." She also knew the victim but would not allow the victim to stay with her because the relationship between the victim and Petitioner was "toxic." She said: "[The victim] wanted to use and when [Petitioner] didn't want to use, they would argue and fight for the drugs and stuff and I just felt like it was best if she wasn't around him."

Ms. Logan testified that Petitioner did not use drugs around her and her children. She also asserted that he was an excellent father, helped her with household chores, walked the dog, and he picked her children up from school. However, Ms. Logan said: "But when he got that phone call, he was gone to get high with her." Concerning Petitioner's mental state prior to the victim's murder, Ms. Logan testified:

> Right before that, my grandmother had passed away maybe like about a year or something before that. And [Petitioner] was incarcerated when she passed away. So that kind of bothered him really bad. So he would cry in his sleep all the time for my grandmother. This was right before the incident happened so he had a lot of trouble sleeping and he didn't sleep. So he started drinking heavily, like, during the daytime he would drink. I'd get home from work and I'd notice that he'd be drunk and it would be, like, three or four o'clock in the afternoon and he's already high and drunk. So I would, you know, try to take him to do things like family things and stuff like that to try to prevent him, you know, from constantly using. And when we would do that, that would work fine until either my other uncle would come and pick him up or T would come and get him and that's when everything just would spiral out of control.

Ms. Logan testified that she was interviewed by someone from the Public Defender's Office.

Petitioner was recalled as a witness and asserted the following:

- 12 -

On the theft of property [trial counsel] entered guilty pleas in front of the jury without me agreeing to it. You know, and that made the jury look at me like I'm guilty all the way around the board, you know, and I think that violated my constitutional right under [the] Sixth Amendment.

Upon questioning by the post-conviction court, Petitioner said that trial counsel never discussed the guilty plea with him, and he asserted that trial counsel was untruthful. Petitioner agreed that he was present when trial counsel announced that Petitioner admitted to the theft charge but that he thought that he could not say anything because he had asserted his Fifth Amendment privilege against self-incrimination. The post-conviction court then pointed out that Petitioner did not assert his Fifth Amendment privilege until the middle of the trial, which was after trial counsel had announced that Petitioner admitted to the theft charge.

The post-conviction court made extensive findings of fact in its written order denying post-conviction relief concerning each claim raised by Petitioner. The post-conviction court ultimately resolved any credibility issues between Petitioner and trial counsel in favor of trial counsel, and found that Petitioner failed to prove ineffective assistance of counsel by failing to prove either deficient performance or prejudice. It is from this judgment that Petitioner now appeals.

**Analysis**

Petitioner contends on appeal that the post-conviction court erred in finding that he received the effective assistance of both trial and appellate counsel. More specifically, Petitioner argues that trial counsel was ineffective for failing to object to hearsay testimony by Ms. Greer and for failing to impeach Ms. Greer with a prior inconsistent statement. He further contends that trial counsel: failed to seek a jury-out hearing or mistrial when a juror disclosed that she recognized Petitioner from a television news report; announced in front of the jury that Petitioner was pleading guilty to theft of property under count two of the indictment; and failed to object to the trial court's jury instruction concerning his guilty plea to the theft charge. Finally, Petitioner argues that appellate counsel was ineffective for failing to raise the trial court's instruction concerning the guilty plea as an issue on appeal. The State responds that Petitioner is not entitled to relief on these claims because trial counsel and appellate counsel made strategic decisions and that their performance was not deficient.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency

was prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993).  Failure to satisfy either prong results in the denial of relief.  *Strickland*, 466 U.S. at 697.  Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor.  *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)).  The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence.  T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009).  The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings.  *Dellinger*, 279 S.W.3d at 294. The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness.  *Calvert*, 342 S.W.3d at 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with no presumption of correctness.  *Id.*; *Dellinger*, 279 S.W.3d at 294; *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008).

Review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997).  We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision.  *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).  Deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case.  *See Cooper v. State,* 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)).  The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial.  *Id.*  The stronger the proof of guilt presented at trial, the more difficult it is to prove the prejudice prong of *Strickland*.  When proof of guilt is overwhelming, proving prejudice is exceedingly difficult.  *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App., at Nashville, May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice), *perm. app. denied* (Tenn. Sept. 19, 2012); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App., at Nashville, Mar.

1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial), *no perm. app. filed.*

## I. Trial Counsel

### a. Failure to Object to Hearsay Testimony

Petitioner argues that trial counsel rendered deficient performance by failing to object to hearsay testimony by Ms. Greer about statements that the victim said to Ms. Greer's daughter, Octavia. Concerning this issue, the post-conviction court found:

> With regard to this issue, Petitioner has failed to demonstrate either "deficient performance" or "prejudice." First, there has been no showing that trial counsel misunderstood the law of evidence pertaining to hearsay. As such, the decision not to object to the evidence in order to avoid "highlighting" it for the jury is a strategic decision that should not be second-guessed on post-conviction. Second, the assessment of trial counsel that the evidence was going to come in regardless of his objection had not been shown to be inaccurate. Third, the statement of the victim to call the police was not hearsay, the statement that she did not want to leave with the defendant was likely admissible under the state of mind exception, and all of the statements were likely admissible under the non-testimonial, excited utterance exception.

The record does not preponderate against the post-conviction court's findings. Trial counsel testified that he did not object to Ms. Greer's testimony because it was partially helpful to the defense. He further said that her testimony was going to come out anyway at trial through other witnesses and that he did not want to object and highlight her testimony in front of the jury. Trial counsel's decision not to object to Ms. Greer's testimony was a strategic one that was made with adequate information as a result of trial preparation and will not be second-guessed by this court. *Hellard*, 629 S.W.2d at 12; *Tolliver v. State*, 629 S.W.2d 913, 914 (Tenn. Crim. App. 1981); *Daniel Muhammad v. State*, No. W2015-01923-CCA-R3-PC, 2016 WL 6915969, at *7 (Tenn. Crim. App., at Jackson, Nov. 22, 2016) (trial counsel's decision not to object "because he did not want to annoy the jury" was a strategic one), *perm. app. denied* (Tenn. April 13, 2017); *State v. Donald Craig and William Meadows, Jr.*, No. 85-10-III, 1985 WL 3866, at *3 (Tenn. Crim. App., at Nashville, Nov. 27, 1985) ("There is no obligation on a lawyer to object at every opportunity."), *perm. app. denied* (Tenn. Mar. 3, 1986). Trial counsel's performance concerning this issue was not deficient nor has Petitioner shown that he was prejudiced by trial counsel's performance. Petitioner is not entitled to relief on this issue.

### b.  Failure to Impeach the Credibility of Ms. Greer

Petitioner contends that trial counsel was ineffective for failing to impeach Ms. Greer's testimony with a prior inconsistent statement.  Concerning this claim, the post-conviction court found:

> When asked why [trial counsel] did not pursue the matter further, [trial counsel] testified that he did not want to highlight the matter even further for the jury.  Considering the fact that there was other admissible evidence that the defendant had said something to the effect of 'Now, bitch, you can go" the strategic decision not to pursue the impeachment further in order to avoid "highlighting" it for the jury should not be second-guessed.  Petitioner has failed to establish "deficient performance" with regard to this issue.  Furthermore, taking into consideration the nature of the defense that was offered in this case, i.e. the extensive proof that the defendant could not premeditate based on his impaired brain functioning as a result of multiple causes including years of alcohol and drug abuse, the fact that this statement was made without further impeachment could not have affected the outcome of the case.  Hence, Petitioner has shown no prejudice.

Again, the record does not preponderate against the post-conviction court's findings.  Trial counsel testified he challenged Ms. Greer's testimony that Petitioner said, "Done now, bitch," after he stabbed the victim by asking her on cross-examination why the statement did not appear in any police report.  Trial counsel acknowledged that Ms. Greer's testimony was not helpful to the defense.  However, he said that "rather than belabor the issue and again highlight it for the jury, [he] attempted to turn a bad thing into a good thing."  Trial counsel noted that part of the defense was that the situation prior to the victim's death was "out-of-control" and that there was "no *mens rea* commensurate with premeditation and intent."

On cross-examination, trial counsel testified that he did not recall whether Ms. Greer gave a formal statement and that he only recalled "talking to Ms. Greer on her front porch."  Trial counsel agreed that he could not impeach Ms. Greer with just the police report.  He said, "it's very difficult to impeach somebody with something that's not there."

Trial counsel's decision not to pursue the impeachment of Ms. Greer's testimony at trial was again a strategic one that was made with adequate information as a result of trial preparation and will not be second-guessed by this court even though the strategic decision was ultimately unsuccessful.  *Hellard,* 629 S.W.2d at 12; *Granderson*, 197 S.W.3d at 790.  We further conclude that there is no proof that Ms. Greer actually made a prior inconsistent

statement. The fact that the police report did not contain the statement in question or that Ms. Greer could not recall whether she told police about the statement does not mean that it was not made. Petitioner is not entitled to relief on this issue.

*c. Juror Bias*

Petitioner contends that trial counsel was ineffective for failing to seek a mistrial or jury-out hearing when a juror disclosed, after deliberations had begun, that she recognized Petitioner from a television news report that she had seen approximately two years before the trial. Concerning this issue, the post-conviction court found:

> While perhaps it would have been better to pursue the matter further outside the presence of the other jurors, absent a showing that the juror was actually biased or had information about the case that was not proper for the jury to consider, the Petitioner has failed to demonstrate any "prejudice."

The record supports the trial court's findings.

During deliberations, the following exchange took place:

THE COURT: I did get a question, but here's what this note says. One of the jurors just- remembered she saw this case on the news two years ago. She remembers seeing [Petitioner's] face on TV, what should we do?

[Defense Counsel]: Would you like me to answer that?
THE COURT: I always let the lawyers attempt to answer it first or suggest an answer.

[Defense Counsel]: They should come back on reckless homicide.

THE COURT: Huh?

[Defense Counsel]: They should come back on reckless homicide.
[Prosecutor]: They should continue to deliberate, Your Honor, and do their jobs.
THE COURT: Okay. Bring them back in here.
    *    *    *

- 17 -

THE COURT:     All right.  I received a question from the jury room.  I will read it.  "One of the jurors just remembered she saw this case on the news two years ago.  She remembers seeing his face on TV.  What should we do?" Answer continue deliberating.  You're excused to continue your deliberations.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to trial by an impartial jury.  U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)).  Challenges to juror qualifications may be (1) *propter defectum*, "on account of defect," or (2) *propter affectum*, "on account of prejudice." *See State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993).  *Propter defectum* disqualifications are those based on alienage, family relations, or other statutory mandate and must be challenged before the return of a jury verdict.  *Id.*  *Propter affectum* disqualifications are based upon bias, prejudice, or lack of impartiality and may be made after the jury verdict.  *Id.*  A claim of juror bias or lack of impartiality may be asserted in a petition of post-conviction relief.  *See Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *76 (Tenn. Crim. App., at Jackson, Aug. 29, 2014), *no perm. app. filed*.

The Tennessee Constitution guarantees each defendant "'a trial by a jury free of ... disqualification on account of some bias or partiality toward one side or the other of the litigation.'" *Akins*, 867 S.W.2d at 354 (quoting *Toombs v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)).  "Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them in response to those natural and human instincts common to mankind interfere with the underpinnings of our justice system." *Id.*  During voir dire, jurors are obligated to make "full and truthful answers ... neither falsely stating any fact nor concealing any material matter." *Id.*

To prevail on a claim of juror bias, the defendant must establish a prima facie case of bias or partiality.  *Id.*  "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id.*  Additionally, "failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." *Id.* at 356.  The intent of the juror is not dispositive of the issue of bias.  *Id.* at n. 15.

In this case, trial counsel testified that he did not request a mistrial or jury-out hearing to question the jury as to her bias because he liked the jury, and he did not think they were "going to get any better if [they] excused this juror."  Additionally, trial counsel

did not think that the juror was biased. We conclude that trial counsel made a strategic decision not to request a mistrial or jury-out hearing because of juror bias. *See George Washington Matthews v. State*, No. W2018-00966-CCA-R3-PC, 2019 WL 1110101, at *8 (Tenn. Crim. App., at Jackson, Mar. 11, 2019) (trial counsel made a strategic decision not to remove the juror because he believed that the juror would listen carefully to the facts, and counsel was concerned that the State would use all of its peremptory challenges to remake the jury) *no perm. app. filed*. Furthermore, Petitioner did not present the juror in question at the post-conviction hearing, nor did he present any evidence to show that the juror was actually biased against him. *Id.; see Smith v. State*, 357 S.W.3d 322, 348 (Tenn. 2011). Therefore, he cannot show any prejudice, and he is not entitled to relief on this claim.

### d. Guilty Plea to Theft

Petitioner argues that trial counsel's performance was deficient because he announced "in open court and in front of the jury" that Petitioner was pleading guilty to count two of the indictment which charged him with theft of property valued at more than $1,000 but less than $10,000. Concerning this issue, the post-conviction court found:

> Finally, [trial counsel] testified that the defense team decided as a strategy that to gain credibility with the jury to announce after the reading of the indictment a guilty plea as to the theft charge. [Trial counsel] further testified that this strategy was discussed with the [Petitioner] prior to the announcement being made in open court in the presence of the jury.
>
> [Petitioner] testified again that the entry of the guilty plea by his attorney in the presence of the jury violated his right to a jury trial in violation of the Sixth Amendment. He testified that his lawyers never advised him that they were going to enter a guilty plea to the theft case prior to trial and that he did not say anything during the trial because he did not think that he could do so. The notice of impeachment filed in this case indicated that the defendant had ten prior felony convictions and four other misdemeanor crimes of dishonesty. During the post-conviction evidentiary hearing, Petitioner acknowledged a significant prior criminal record.
>
> This court resolves the credibility issues between the defendant and his trial counsel in favor of trial counsel. This Court finds that Petitioner was made aware of this strategic decision prior to the announcement of the guilty plea in open court in the presence of the jury and remained "mute" concerning the matter. This court also

- 19 -

finds it incredible that the [Petitioner] thought he could not say anything in court if his counsel tried to plead him guilty without his knowledge. [Petitioner's] testimony is not believed by t[h]is Court.

The record supports the post-conviction court's findings. In answering the indictment, trial counsel announced in front of the jury that Petitioner pled guilty to theft of the truck. However, Petitioner did not enter a guilty plea in accordance with Rule 11 of the Tennessee Rules of Criminal Procedure, nor did he sign any documents indicating that he desired to plead guilty. No judgment of conviction was offered. The decision to plead guilty or not guilty is a matter reserved solely for the accused. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). In *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), the United States Supreme Court held that a guilty plea, as recognized in *Boykin v. Alabama,* 395 U.S. 238 (1969), is an event of signal significance in a criminal proceeding. By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers. *Boykin,* at 243. While a guilty plea may be tactically advantageous for the defendant, *id.,* at 240, the plea is not simply a strategic choice; it is "itself a conviction," *id.,* at 242, and the high stakes for the defendant require "the utmost solicitude," *id.,* at 243. Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf. *Brookhart v. Janis,* 384 U.S. 1, 6–7 (1966).

While Petitioner at the post-conviction hearing claimed that he was surprised to hear trial counsel announce at trial that Petitioner was pleading guilty to the theft charge and that he told trial counsel that he did not wish to plead guilty, trial counsel specifically recalled discussing a guilty plea with Petitioner prior to trial, and the post-conviction court accredited trial counsel's testimony concerning this claim of ineffective assistance of counsel. We defer to the post-conviction court's credibility determination. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001).

Trial counsel further testified that it was part of trial strategy to plead guilty to the theft charge to gain credibility with the jury. According to trial counsel, that the same had been a common trial strategy in that district to "admit to what we did" but argue that the state overcharged and defendant should be found guilty of a lesser-include offense. Tennessee case law is replete with cases in which a defendant's trial counsel admitted or conceded guilt of a charged offense as a trial strategy to gain credibility with the jury. *Colin D. Savage v. State*, No. M2019-01740-CCA-R3-PC, 2021 WL 1117031, at *10-11 (Tenn. Crim. App., at Nashville, Mar. 24, 2021), *no perm. app. filed*; *Stephen Gerard Smith* v. *State*, No. M2020-00559-CCA-R3-PC, 2021 WL 1561396, at *11-12 (Tenn. Crim. App., at Nashville, April 21, 2021), *no perm. app. filed*; *Charles Travis Maples v. State*, No. E2019-00475-CCA-R3-PC, 2020 WL 918612, at *6 (Tenn. Crim. App., at Knoxville, Feb. 26, 2020) *no perm. app. filed*; and *Henry Eugene Hodges v. State*, No. 1999-00516-CCA-

R3-PD, 2000 WL 1562865, at *18-20 (Tenn. Crim. App., at Nashville, Oct. 20, 2000) *perm. app. denied* (Tenn. Mar. 26, 2001).

In *State v. Hawkins*, 519 S.W.3d 1 (Tenn. 2017), after the jury was empaneled and sworn and the indictment was read in the presence of the jury, defense counsel announced that defendant wished to plead guilty to two of the charges. *Id.* at 39. However, in *Hawkins*, defendant requested the judge accept the guilty pleas under Rule 11 and the trial judge refused to accept the pleas. The Tennessee Supreme Court upheld the decision of the trial judge to refuse to accept a guilty plea at that point in the trial, pointing out that Rule 11(b) does not prescribe a process for trial courts to follow when a defendant waits until a jury has been sworn to announce his intention to plead guilty to some of the charges of the indictment without previously notifying the trial judge of his intent to do so. *Id.* at 39-40. The facts in *Hawkins* are distinguishable from the case at hand. Petitioner in this case did not offer to enter a plea under Rule 11. The trial judge had no opportunity to reject a plea. As trial counsel testified, his strategy was to admit the theft charge to gain credibility with the jury. We conclude that trial counsel's strategy while ultimately unsuccessful, was reasonable in light of the evidence presented at trial. *Hellard,* 629 S.W.2d at 12; *Granderson,* 197 S.W.3d at 790. Petitioner has failed to show that trial counsel's performance regarding the guilty plea was deficient.

Even if trial counsel's awkward strategy was deficient, Petitioner has failed to show that he was prejudiced by such strategy. The proof of Petitioner's guilt as to the victim's murder was overwhelming, and he received a life sentence. Additionally, the proof of the theft was sufficient for the jury to find him guilty of the charge. Witnesses saw Petitioner driving the stolen truck both before and after the murder. *Maurice Blocker*, 2016 WL 3009255, at *6. Petitioner is not entitled to relief on this claim.

*e. Failure to Object to the Jury Instructions Concerning the Guilty Plea to Theft*

Petitioner argues that the trial court erred by instructing the jury that he pled guilty to the theft but subsequently submitting the charge to the jury and that trial counsel was ineffective for failing to object to the instructions. This court noted in its opinion on direct appeal that "during its instructions to the jury after the close of proof, the trial court stated, 'The Defendant pleads not guilty to the first count and guilty to the second court [charging him with theft]." *Maurice Blocker*, 2016 WL 3009255, at *5. The post-conviction court considered this issue in the context of whether it should have been included in the motion for new trial and said:

> With regard to the failure to include in the motion for new trial a claim that the trial judge erred in charging the jury that the defendant entered a guilty plea to the theft charge, it must be remembered that

trial counsel invited this error by verbalizing a guilty plea in the presence of the jury and by not objecting to the jury instructions when they were given by the trial judge. In this posture there is no chance the trial judge would have granted a new trial and no reasonable probability of a different outcome on appeal. Tenn. R. App. P. [36.(b)] provides in part that: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." In this case, the defense decided as a tactical matter and in order to gain credibility with the jury to announce a guilty plea to the theft in open court after the reading of the indictment. This unorthodox procedure was part of the defense plan and a strategic matter.

In this case, the trial court was faced with the unique situation where defense counsel announced in front of the jury that his client pled guilty to the charge of theft. As previously discussed, the plea agreement procedure set out in Rule 11 of the Tennessee Rules of Criminal Procedure was not followed for the entry of a guilty plea. The trial court made the following comments at trial regarding this issue: "I'm going to submit the issue of the guilt or innocence of the defendant on the theft to the jury …[for] their consideration unless the defendant is willing to enter into a regular guilty plea right now outside the presence of the jury." *Maurice Blocker*, 2016 WL 3009255, at *5. In the opinion on the direct appeal, this court cautioned the trial court that its decision to inform the jury of a defendant's partial or incomplete guilty plea to a charge before submitting that same charge to the jury is fraught with peril and that such practice was discouraged in the future. *Id.*

During the post-conviction evidentiary hearing, the post-conviction court stated:

It's obvious that I messed up whatever I put in the instructions, but the Court of Criminal Appeals didn't tell me what to put in there, how the correct way to handle it when a person stands up in open court, ambushes you in the presence of the jury and says, I'm guilty of this. What does the judge put in the instructions? And apparently, what I put was not appropriate and I'm not criticizing that, it's just nobody's every told me how to handle that situation…. What do I do with that in the jury instructions? Instruct the jury to ignore the defense attorneys and say he's – and the defendant is, despite what his lawyer, his own lawyer said, is plead—he's pled not guilty?

Later in the post-conviction hearing, the post-conviction court further said:

- 22 -

But I still don't know 100 percent what to do about a defendant who wants to stand up in front of the jury and say I'm guilty but doesn't want to get on the witness stand and have a typical guilty plea hearing and waive his rights.

I thought the safest thing to do was just to consider it as a trial and the jury still had to weigh the evidence and decide whether he's guilty or not. And even though the lawyer stood up and said guilty, that's how we're going to plead in open court and the defendant remained silent, I still felt like if I had just taken it from the jury without them deciding, that that would have been error - - more likely to be error than letting the jury decide on the merits.

But the Court of Criminal Appeals did find the evidence legally sufficient but not overwhelming. But on the other hand, if I'm the State and the other side is pleading guilty, you're really not concentrating on the trial on presenting the strongest evidence you have of something they just pled guilty to. So it was just really an unusual situation that I didn't know how to deal with and still not 100 percent sure. But I do know this, I won't be putting in my charge that the defendant pled guilty to it, which I think was the biggest mistake that I made. But highly unusual situation.

As the post-conviction court stated in this case, he was "ambushed" and surprised at trial by trial counsel's announcement of guilt. However, because Petitioner failed to enter a guilty plea in accordance with Rule 11, the trial court was correct in sending the charge to the jury for consideration. Even though Petitioner did not enter a guilty plea in accordance with Rule 11, the trial court properly instructed the jury that Petitioner pled guilty to the theft because that was what trial counsel told the jury. We recognize the dilemma faced by trial courts in cases such as this. The better practice would have been for the trial court to hold a discussion outside the presence of the jury following the announcement of guilt in order to clarify Petitioner's intentions regarding the entry of a guilty plea. If Petitioner desired to plead guilty, the trial court could have then declined to accept the guilty plea. *See Hawkins*, 519 S.W.3d at 39-40. If the trial court accepted the guilty plea, appropriate procedures under Rule 11 could then have be followed and the charge would not have been presented to the jury. *See Colin D. Savage* 2021 WL 1117031, at *10-11. If Petitioner clarified that he did not wish to enter a guilty plea, the trial court could have instructed trial counsel to refrain from characterizing Petitioner's trial strategy as a guilty plea and to instead use words such as "not contesting" or "conceding" or "admitting" Petitioner's involvement in taking the truck in question. The State would then also have been on notice that it was required to put on proof of the charge, and the charge would have been presented to the jury.

Despite the fact that Petitioner did not enter a guilty plea in accordance with Rule 11, we conclude that trial counsel was not ineffective for failing to object to the trial court's instructions concerning the theft charge. As discussed above, trial counsel made a strategic decision to admit Petitioner's guilt to the theft charge in order to gain credibility with the jury in hopes that the jury would find Petitioner guilty of a lesser-included offense of first-degree murder, and Petitioner had nothing to lose by pleading guilty to the theft charge. Nothing in the jury instructions given by the trial court were erroneous or misleading, and as pointed out by the State, Petitioner has not suggested an alternative instruction. In its order denying post-conviction relief, the post-conviction court said:

> The Tennessee Pattern Jury Instructions – Criminal 1.01 (Thomson-Reuters) contains routine language to the effect: "The defendant pleads not guilty to each and every offense embraced in the indictment." Because the defense attorney stood before the jury and said the defendant pled not guilty to the murder, but guilty to the theft, the trial court modified this instruction as follows: "The defendant pleads not guilty to the first count and guilty to the second court." Trial counsel did not object to this modification nor was the matter addressed.

Trial counsel testified that he read the instructions prior to them being read to the jury. He did not object to the instruction informing the jury that Petitioner pled guilty to the theft charge because he had already told the jury that Petitioner pled guilty to the charge, and it went along with his trial strategy. Again, a strategic decision made with adequate information as a result of trial preparation will not be second-guessed by this court even though the strategic decision was ultimately unsuccessful. *Hellard,* 629 S.W.2d at 12; *Granderson*, 197 S.W.3d at 790. Petitioner has not shown that trial counsel's performance was deficient.

Additionally, Petitioner has not demonstrated that he was prejudiced by trial counsel's failure to object to the jury instructions. As discussed above, the evidence of Petitioner's guilt as to his first-degree murder charge was overwhelming. Additionally, as found by this court on direct appeal, the evidence was sufficient to support Petitioner's conviction for theft of the truck. *Maurice Blocker*, 2016 WL 3009255, at \*6. Petitioner is not entitled to relief on this claim.

## II. Appellate Counsel

Petitioner argues that appellate counsel was ineffective for failing to raise on appeal the issue of the trial court's instructions to the jury concerning the theft charge. In determining whether appellate counsel was constitutionally effective, the same test as to claims of ineffective assistance of counsel at the trial level is applied. *Carpenter v. State*,

126 S.W.3d 879, 886 (Tenn. 2004). To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Carpenter*, 126 S.W.3d at 887. The petitioner satisfies the prejudice prong of the *Strickland* test by showing there is a reasonable probability, or "a probability sufficient to undermine the confidence in the outcome," that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887 (*citing King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999)). Appellate counsel generally has the discretion to determine which issues to raise on appeal and which issues to leave out. *Id.* Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

Concerning appellate counsel's performance, the post-conviction court found:

> [Appellate counsel] testified that he prepared the direct appeal in this matter. He testified that in deciding what issues to raise on appeal he starts with the issues contained in the motion for new trial. Although plain error is allowed, generally the starting point is the motion for new trial. He would not raise something that was not in the motion for new trial unless it rose to the level of plain error. When asked why he did not raise the issue with regard to prior bad acts he stated that he did not think the issue had merit. When asked

- 25 -

why he did not raise a challenge to the jury instructions, he said because he did not think [it] rose to the level of plain error.

To establish plain error: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accuse[d] did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

None of the three issues rose to the level of "plain error" and appellate counsel's determination that the "bad acts" issue had no merit is within the wide range of professional assistance. With regard to the issue concerning the jury instructions, it must be recalled that the defense made a tactical decision to announce to the jury a guilty plea. Further, there is little law available advising a trial court what to do if a defendant refuses to formally plead guilty but then announces a guilty plea after the reading of the indictment. It is respectfully submitted that this unusual and unorthodox situation was such that it cannot be said that a clear rule of law was breached. With regard to the claim of ineffective assistance of appellate counsel, the Petitioner has failed to show either "deficient performance" or "prejudice."

The record does not preponderate against the post-conviction court's findings. Appellate counsel testified that he did not always raise every issue on appeal and that he limited issues on appeal to "what we think has some merit to it." Specifically, concerning the jury instructions on Petitioner's theft charge, trial counsel testified that the trial court's instruction to the jury that Petitioner plead to the theft was accurate, even though Petitioner did not enter a formal guilty plea. Appellate counsel testified that he raised the issue of the guilty plea by challenging the sufficiency of the evidence for the theft conviction. He said that he wanted to make it clear to this court that the guilty plea was not accepted, and Petitioner "really didn't plead guilty to the theft of the truck no matter what one of the trial attorneys may or may not have tried to do."

Appellate counsel further testified that he did not feel that the issue could have been raised under plain error because the issue "was dealt with the way it needed to be." He further noted that the theft charge was not the "meat of the case" because Petitioner was charged with first-degree murder. Appellate counsel said: "You know if he was going to do life, . . . the truck really didn't matter. And we made a good argument I thought on the sufficiency of the truck but they didn't accept it."

Petitioner has not demonstrated that appellate counsel rendered deficient performance by not raising the issue of the jury instructions on appeal. Appellate counsel, with many years of experience in appellate work, clearly made a strategic decision to raise the issue through a challenge to the sufficiency of the evidence as to the theft charge. As we have already discussed, the jury instruction was consistent with trial counsel's strategy of informing the jury of Petitioner's willingness to accept responsibility for the theft of the truck in order to gain credibility with the jury in hopes that the jury would convict him of a lesser-included offense of first-degree murder. Furthermore, Petitioner has not shown that he was prejudiced by appellate counsel's failure to raise the issue of the jury instructions on appeal. Again, the evidence overwhelmingly supported Petitioner's first-degree murder conviction, and this court concluded that the evidence was sufficient to support the theft conviction. *Maurice Blocker*, 2016 WL 3009255, at *6. Petitioner is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE